EAGLES NEST, A JOHN TURCHIN COMPANY, LLC, a North Carolina Limited Liability Company (f/k/a T & A Investments II, LLC, as successor in interest to T & A Hunting and Fishing Club, Inc., a North Carolina Corporation, Plaintiff v. JAMES H. RIDINGER (a/k/a "JR" Ridinger) and wife, LOREN RIDINGER and MIRACLE NC CONSTRUCTION, LLC, a North Carolina Limited Liability Company, Defendants

JAMES RIDINGER AND LOREN RIDINGER, PLAINTIFFS v. EAGLES NEST, A JOHN TURCHIN COMPANY, LLC, T&A HUNTING AND FISHING CLUB, INC, AND JOHN TURCHIN, Defendants

No. COA09-116

(Filed 3 November 2009)

**Contracts— declaratory judgments—cash investment in real estate development—interpretation of contract terms**

In a declaratory judgment action in which the Ridingers invested $1,000,000 with plaintiff (Turchin) in return for 40 acres in a new development and only 30 acres were transferred, the trial court properly required the payment of $250,000 to the Ridingers. The trial court correctly interpreted the contract between the parties; investing cash in a business does not guarantee a profit for the investor.

Appeal by defendants James H. Ridinger, Loren Ridinger, and Miracle NC Construction, LLC, from judgment entered 24 October 2008 by Judge James L. Baker, Jr., in Avery County Superior Court. Heard in the Court of Appeals 20 August 2009.

*Vetro & Lundy, P.C., by Michael Vetro and M. Shaun Lundy, for plaintiff Eagles Nest, a John Turchin Company, LLC.*

*Womble Carlyle Sandridge & Rice, a Professional Limited Liability Company, by Pressly M. Millen and Sean E. Andrussier, for defendants James H. Ridinger, Loren Ridinger, and Miracle NC Construction, LLC.*

ELMORE, Judge.

James H. Ridinger, Loren Ridinger, and Miracle NC Construction, LLC (defendants or the Ridingers), appeal a declaratory judgment in favor of Eagles Nest, a John Turchin Company, LLC (plaintiff or Turchin).[1] For the reasons stated below, we affirm the judgment of the trial court.

1. In addition to defending its judgment below, Turchin argues that the trial court should have dismissed the Ridingers' other claims. Although Turchin fashioned this

## Background

On 14 May 2003, the parties entered into a promissory note drafted by Turchin. The note, in relevant part, reads as follows:

> FOR VALUE RECEIVED, the undersigned (the "Maker"), promises to pay JR. RIDINGER and LAUREN [*sic*] RIDINGER, (the "Holder") the principal sum of *ONE MILLION AND NO/100 DOLLARS ($1,000,000.00)* or so much thereof as has been advanced hereunder, in the following manner:
>
> > Maker shall convey on or before when completed, to Holder as repayment, approximately 40 acres of undeveloped vacant land (the "Property") located within the 300 acre development known as T&A Hunting and Fishing Club (the "Development"), located in Banner Elk, North Carolina. . . .
>
> In the event that the Holder and Maker are unable to agree upon the specific property within the Development to be conveyed, Holder at their option may elect to receive repayment in lawful money of the United State [*sic*] of America, however, such payment shall not be due until completed or June 2005.
>
> This note shall construed [*sic*] and enforced according to the laws of the State of Florida.
>
> * * *
>
> If default be made in the payment of any of the sums mentioned herein in the performance of any of the agreements contained herein, then the entire principal sum shall be at the option of the Holder hereof become at once due and collectible without notice, time being of the essence; and said principal sum shall both bear interest from such time until paid at the highest rate allowable under the laws of the State of Florida. Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default.

Pursuant to this promissory note, the Ridingers paid $1,000,000.00 to Turchin. On 30 June 2005, a North Carolina General Warranty Deed was filed in Avery County that transferred an approximately ten-acre lot in the development from Turchin to defendant Miracle NC Construction, LLC. A second deed was filed on 31 Octo-

---

issue as a cross-assignment of error, it offered no authority or substantive arguments to support it. Accordingly, we do not address it. *See* N.C.R. App. P. 28(b)(6) (2008).

ber 2005 and a third on 5 January 2007. Combined, these three deeds transferred a total of approximately thirty acres from Turchin to defendant Miracle NC Construction, LLC.

On 6 November 2007, Turchin filed a verified complaint for declaratory judgment asking the trial court to "construe and declare the respective rights and obligations of the parties as it relates to the [promissory n]ote and the satisfaction of the terms thereof pursuant to N.C. Gen. Stat. § 1-253, *et seq.*" [R. 8] Specifically, Turchin asked the trial court, (1) "Whether Plaintiff may satisfy the Note by way of payment to Defendants in the amount of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00)" or, in the alternative, (2) "Whether Plaintiff may satisfy the Note by way of conveying to Defendants one of the three (3) remaining platted ten (10) acre parcels of real property in the Development Parcel."

On 20 December 2007, the Ridingers responded with their own complaint, which expounded upon the business deal that they had entered into with plaintiff and the trouble that followed. According to the complaint, Turchin and the Ridingers knew each other socially before 2003, but, sometime during 2003, Turchin informed the Ridingers that he planned to develop Eagles Nest in Avery County but lacked adequate capital to do so. The Ridingers agreed to invest $1,000,000.00 in the development project and executed the promissory note drafted by Turchin. According to the complaint, "the Promissory Note makes clear the intentions of the Ridingers that that [*sic*] their investment objectives would be realized by virtue of Turchin's acumen as a developer. As such, the Ridingers and Turchin were co-venturers." However, the complaint alleges that after the Ridingers received the first thirty acres of property, Turchin

impeded the efforts of the Ridingers to obtain conveyance of the balance of the Property. Among other things, Turchin has taken the position that the Ridingers may not obtain any property on which improvements have been made and that the Ridingers may not obtain any property which has been subdivided into parcels of less than ten acres. [Turchin has] also conveyed and otherwise encumbered portions of the property in a manner which has damaged the Ridingers by purportedly diminishing the amount of property from which they are entitled to chose [*sic*] and the terms upon which they can exercise their choice.

The Ridingers alleged breach of contract, breach of fiduciary duty, and violation of the North Carolina Unfair and Deceptive Practices

Act. The Ridingers received a *lis pendens* on three lots in the development totaling approximately ten acres.

The cases were consolidated on 25 February 2008. Shortly thereafter, the Ridingers filed their answer to Turchin's complaint for declaratory judgment. They denied most of the allegations and asserted the following affirmative defenses: (1) the complaint failed to state a claim; (2) every claim for relief is barred, in whole or in part, by the doctrines of estoppel, waiver, or laches; and (3) the claims are barred by the Statute of Frauds. The Ridingers asked the trial court to dismiss Turchin's complaint on the merits and sought costs and attorneys' fees.

Over the course of the following six months, both parties moved for summary judgment. The trial court heard arguments from counsel in October 2008 and reviewed the contents of the file, the briefs, the proffered case law, the verified pleadings, and the deposition transcripts of James Ridinger and John Turchin. In its order granting summary judgment to Turchin, the trial court made the following relevant findings of fact:

6. That the Court acknowledges the language indicating that this *Note* is to be construed according to the laws of the State of Florida; however, no statutory evidence from the State of Florida has been produced that would suggest that Florida law provides for a different interpretation of the *Note* than the State of North Carolina. Accordingly, it is appropriate to interpret the document from its plain meaning, whether in the State of North Carolina or in the State of Florida.

7. That the *Note* is, in effect, a loan to the Eagles Nest Parties from the Ridinger parties in the original principal amount of One Million Dollars ($1,000,000.00) which was to be repaid in one (1) of two (2) ways: either (a) the repayment to the Ridinger Parties in the principal amount of One Million Dollars ($1,000,000.00), or the portion thereof not yet repaid; or, in the alternative, (b) if the Ridinger Parties and the Eagles Nest Parties were able to agree on the identification of Forty (40) acres of real property, which is not described, but which the evidence indicates as being a part of a 258.77 acre tract as owned by the Eagles Nest Parties on the date of the making of the *Note*.

\* \* \*

10. That the question that comes to the Court is the paragraph that reads: "In the event that the Holder and the Maker are unable

to agree upon the specific property within the Development to be conveyed, Holder at their option may elect to receive payment of lawful money of the United State (sic) of America, however, such payment shall not be due until completed or June 2005."

11. That regardless of the meaning of "completed" or "June 2005," the Parties are unable to agree as to additional acres that the Eagles Nest Parties are willing to₍ convey and that the Ridinger Parties are willing to accept, which fact is supported by the documentary evidence and deposition transcripts, and by the pleadings; specifically, the Ridinger Parties *Answer* at paragraph 26 states that "the parties have been unable to agree."

12. That in the event the Parties are unable to agree on land, the Holder of the *Note* may receive payment in lawful money.

13. The exchange of land is no longer an option and, therefore, the Ridinger Parties are entitled to receive payment in lawful money.

14. That it has been pointed out to the Court that the *Note* does not provide for the payment of interest and that the *Note* is not a type of agreement that someone might enter into; however, the face of the document reflects the terms of the agreement into which the Parties entered.

In its decree, the court stated that the Ridingers were "entitled to receive final payment in the amount of" $250,000 "and that said amount is due to the Ridinger Parties when they so request it."

## Argument

The Ridingers argue that the trial court misconstrued the promissory note and that it should have concluded that the Ridingers' recourse was not "limited to a refund of $250,000 at Mr. Turchin's election" and instead the note could also reasonably "be construed to mean that the Ridingers may elect to receive *the value* of a 10-acre lot." We disagree.

"The standard of review for summary judgment is de novo." *Forbis v. Neal*, 361 N.C. 519, 524, 649 S.E.2d 382, 385 (2007) (citation omitted). "Summary judgment is appropriate if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a mat-

ter of law.' " *Id.* at 523-24, 649 S.E.2d at 385 (quoting N.C. Gen. Stat. § 1A-1, Rule 56(c) (2005)).

First, we point out that the refund of $250,000 is available at the *Ridingers'* election, not Turchin's. The promissory note specifies that the Holder, at its option, may elect payment. The promissory note defines the Holder as the Ridingers and Miracle NC Construction, LLC. The summary judgment order also specifies that the Ridingers may elect to receive the refund.[2]

The Ridingers point us to a Florida case, *Gleason v. Leadership Housing, Inc.*, as support for interpreting "repayment" to include the value of a ten-acre lot. 327 So.2d 101 (Fla. Dist. Ct. App. 1976). In *Gleason*, a Florida developer had contracted with Jackie Gleason, the entertainer, to publicize a new development, design a golf course for the development, and try to have a golf tournament held there. *Id.* at 102. In return, Gleason would receive a monthly salary, the "privilege of leasing a residence," and "the right to purchase a portion of the [development] at a designated 'bargain' price. . . . The selection of the land [would] be subject to the approval of both parties." *Id.* The contract also listed certain selection criteria for the parcel. *Id.* Gleason performed his side of the bargain, but the developer parried Gleason's repeated attempts to arrange the selection of a parcel and a closing date by acknowledging the obligation but refusing to commit to further action. *Id.* at 103. After two years of refusing Gleason's requests, the developer proposed a tract in January 1972. *Id.* However, the tract did not meet the selection criteria in the contract and Gleason rejected the offer. *Id.* The developer offered a second parcel in February 1972, which similarly failed to meet the selection criteria in the contract and was rejected by Gleason. *Id.* The developer offered no other parcels to Gleason. *Id.* Gleason sued the developer for specific performance of the contract, but later amended the complaint to seek damages. *Id.* The developer countered that the contract was invalid. *Id.* The trial court granted final judgment in favor of the developer after concluding that the agreement violated the Statute of Frauds and, thus, could not support a claim for damages. *Id.* at 103.

---

2. Although the promissory note does not specify an interest rate, it does state that, in the event of a default "in the payment of any of the sums mentioned herein," the "entire principal sum shall be at the option of" the Ridingers "at once due and collectible without notice" and "said principal sum shall both bear interest from such time until paid at the highest rate allowable under the laws of the State of Florida." The trial court did not address this acceleration clause nor do the Ridingers address it in their brief. However, this clause might offer the Ridingers some relief as it appears that Turchin may have been in default since at least June 2005.

On appeal, the Court of Appeals of Florida, Fourth District, reversed the trial court's judgment. *Id.* at 105. The appellate court "assum[ed] for the purpose of [its] decision that the agreement was, in fact, in violation of the Statute of Frauds" and held that the developer was "estopped to contest the validity of the agreement under the doctrine of equitable estoppel." *Id.* at 104. The court explained that Gleason was prejudiced by the developer taking "a position completely inconsistent with that taken by it prior to litigation, and upon which Gleason relied" to his detriment. *Id.* at 104. Had the developer not "continuously over a three-year period led Gleason to believe that the contract was valid and that land meeting the contract standards would be conveyed to him," Gleason might have accepted one of the parcels that he rejected in 1972 because "any of the property was worth substantially more than the [bargain] price called for by the contract." *Id.* at 104-05. The court noted that whether the developer

> got that much value from the use of Gleason's name and his services up to the time the contract was terminated is not the issue; rather, it is simply that in exchange for receiving such benefit[, the developer] agreed to sell at a bargain price 16.8 acres of land so that Gleason could ultimately realize a gain therefrom.

*Id.* at 105. Because the only relief available to him was an award of damages, the court concluded that the "proper measure" of damages should be the value of the last parcel that the developer offered to Gleason in February 1972, as of the date that it was offered, minus the "bargain price" stipulated in the contract, plus interest from the offer date until the judgment date. *Id.*

Although factually similar in several ways, a critical difference between *Gleason* and the case at hand is this: The contract in Gleason did not include a provision for how repayment would be calculated if the parties could not agree on a parcel. The *Gleason* court even commented that whether the parties received the value that they had anticipated was irrelevant; the contract boiled down to an exchange of services for land. Here, the contract boils down to an exchange of cash for land. However, the contract also clearly states that, if the parties cannot settle on the land, the Ridingers may choose a refund of their investment. The Ridingers have, apparently, not chosen such a refund. Like the court in *Gleason*, we cannot say whether the Ridingers will receive the payoff that they had hoped for or whether the parties were unwise to enter into this agreement.

IN RE S.R.G.

[200 N.C. App. 594 (2009)]

We observe that investing cash in a business does not guarantee a profit for the investor. It appears that the Ridingers realized a profit on their investment with respect to the three parcels they were deeded in the development; whether their profit was diminished by unethical or illegal acts by Turchin is not a question currently before this Court and remains to be determined at the trial level. The only question before this Court now is whether the trial court improperly interpreted the contract between the parties. We hold that it did not. Accordingly, the judgment of the trial court is affirmed.

Affirmed.

Judges BRYANT and BEASLEY concur.